DAVID L. HENKIN      #6876
ELENA L. BRYANT      #9548
LEINĀʻALA L. LEY     #9710
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
Telephone No.:  (808) 599-2436
Fax No.:  (808) 521-6841
Email:  dhenkin@earthjustice.org
        ebryant@earthjustice.org
        lley@earthjustice.org

Attorneys for Plaintiffs

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAIʻI

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; AMERICAN BIRD CONSERVANCY; CONSERVATION COUNCIL FOR HAWAIʻI; DEFENDERS OF WILDLIFE; NATURAL RESOURCES DEFENSE COUNCIL; NATIONAL PARKS CONSERVATION ASSOCIATION; SIERRA CLUB; and WILDEARTH GUARDIANS,<br><br>        Plaintiffs,<br><br>    v.<br><br>DAVID BERNHARDT, U.S. Secretary of the Interior; and U.S. FISH AND WILDLIFE SERVICE,<br><br>        Defendants. | CIVIL NO.  1:21-CV-00041<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Center for Biological Diversity, American Bird Conservancy, Conservation Council for Hawaiʻi, Defenders of Wildlife, National Park Conservation Association, Natural Resources Defense Council, Sierra Club, and WildEarth Guardians (collectively, "Plaintiffs") file this Complaint to challenge the U.S. Fish and Wildlife Service's promulgation of a new rule implementing section 4(b)(2) of the Endangered Species Act, 16 U.S.C. § 1533(b)(2), which strips vital protections from federal lands and other areas that the best available science indicate are necessary for the conservation of threatened and endangered species. Specifically, Plaintiffs hereby complain of the actions of David Bernhardt, in his official capacity as the United States Secretary of the Interior, and U.S. Fish and Wildlife Service ("FWS") (collectively, "Defendants"), as follows:

INTRODUCTION

1. Congress enacted the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, in 1973 to affirm our nation's commitment to the conservation of threatened and endangered species and their habitat – the forests, grasslands, prairies, rivers, and seas these species need to survive. Congress specifically gave "conservation" a sweeping definition – the use of all methods and procedures necessary to recover threatened and endangered species so that they no longer need the Act's protections. 16 U.S.C. § 1532(3). The ESA works, in significant part, by

2

placing the survival and recovery of imperiled animals and plants at the forefront of every federal action and decision.  Since its enactment, the ESA has prevented the extinction of 99 percent of the species under its protections.

2.    Habitat destruction and degradation are major, and often determinative, factors in the decline of many species listed as threatened or endangered under the ESA.  Thus, a key tool the Act provides to promote the survival and recovery of listed species is the designation of critical habitat, which protects physical or biological features and areas that are identified as "essential to the conservation of the species."  *Id.* § 1532(5)(A)(i), (ii).  Once FWS designates an area as critical habitat, federal agencies are prohibited from authorizing, funding, or carrying out any action that will destroy or adversely modify that habitat.  *Id.* § 1536(a)(2).  Private projects with a federal nexus—such as oil and gas exploration, mining and logging on federal lands—are subject to this prohibition.

3.    This lawsuit challenges Defendant FWS's final rule, promulgated on December 18, 2020, which changes how FWS implements ESA Section 4(b)(2), skewing the critical habitat designation process in favor of stripping vital protections from areas that imperiled species need for their continued survival and eventual recovery.  *See* 85 Fed. Reg. 82,376 (Dec. 18, 2020) (the "Mandatory Exclusion Rule") (to be codified at 50 C.F.R. § 17.90).  Specifically, the

3

Mandatory Exclusion Rule:  (1) unlawfully prevents FWS from exercising statutorily conferred discretion to make decisions whether to designate particular areas as critical habitat on a case-by-case basis; (2) impermissibly grants opponents of critical habitat designation outsized weight in decisions about critical habitat that should prioritize species' recovery needs and be guided by the best available science; and (3) makes it easier to strip protection from essential habitat located on federal lands, where critical habitat designation confers the greatest conservation benefits.

4.     For nearly half a century, the Department of the Interior and Department of Commerce, acting through FWS and the National Marine Fisheries Services ("NMFS") (collectively the "Services"), have administered the ESA through jointly promulgated regulations.  FWS has jurisdiction over terrestrial species, and NMFS has jurisdiction over marine species, with the agencies sharing jurisdiction over sea turtles and salmon, which move between the land and the sea to engage in essential life functions.  FWS also has jurisdiction over polar bears, sea otters, manatees, dugongs, and walruses.  NMFS did not join FWS in promulgating the Mandatory Exclusion Rule and continues to implement ESA Section 4(b)(2) pursuant to joint regulations codified at 50 C.F.R. part 424.

5.     The Mandatory Exclusion Rule violates the ESA's plain language and its overriding purpose to promote endangered and threatened species' survival and

recovery by stripping FWS of its statutory discretion to make critical habitat

designations on a case-by-case basis as necessary to protect listed species.  It is

thus arbitrary and capricious and contrary to law under the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*  The Mandatory Exclusion Rule

also illegally delegates duties statutorily entrusted to FWS to critical habitat

opponents, who now will often have the final word on how FWS must weigh

nonbiological harms when deciding whether to exclude from designation as critical

habitat areas that the best science has identified as essential to a species'

conservation.  Finally, the Mandatory Exclusion Rule arbitrarily reverses prior

agency policy prioritizing critical habitat designation on federal lands, in violation

of the APA.

6.     In promulgating its illegal rule FWS failed to consider and disclose

the regulation's significant environmental impacts in violation of the National

Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*  The Mandatory

Exclusion Rule removes important protections for areas that are essential for the

conservation of endangered and threatened species and will significantly impact

the human environment by undermining the ESA's purpose and protections.  As a

major final action, the rule's significant and adverse impacts on imperiled species

and the ecosystems on which they depend preclude the use of a categorical

exemption from NEPA and require the preparation of an Environmental Impact Statement ("EIS").

7.    For these violations of law, Plaintiffs seek an order (1) declaring the Mandatory Exclusion Rule invalid, (2) vacating the Mandatory Exclusion Rule, and (3) enjoining reliance on the Mandatory Exclusion Rule.

## JURISDICTION AND VENUE

8.    Plaintiffs bring this action pursuant to the APA, 5 U.S.C. §§ 701-706. This Court has jurisdiction over this action by virtue of 28 U.S.C. § 1331 (actions under the laws of the United States) and 28 U.S.C. §§ 2201-2202 (power to issue declaratory judgments in cases of actual controversy).

9.    Venue is properly vested in this judicial district under 28 U.S.C. § 1391(e), because this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacity or under color of legal authority, Plaintiff Conservation Council for Hawai'i resides in this district, other Plaintiffs have members and offices in this district, and many of the consequences of the Defendants' violations of the laws giving rise to the claims articulated herein occurred or will occur in this district.

10.    The challenged agency action is final and subject to this Court's review under the APA, 5 U.S.C. §§ 701-706.

PARTIES

PLAINTIFFS

11.    Plaintiff Center for Biological Diversity ("the Center") is a nonprofit conservation organization dedicated to the protection of native species and their habitats through science, policy, and the effective implementation of environmental laws such as the ESA.  The Center is incorporated in California and headquartered in Tucson, Arizona, with field offices throughout the United States and Mexico, including in Honolulu, Hawai'i.  The Center has more than 1.7 million members and online activists dedicated to the protection and restoration of endangered species and native ecosystems.  As a result of the Center's work, over 700 species and nearly half a billion acres of critical habitat have been protected under the ESA.

12.    The Center has a long history of environmental advocacy with a particular focus on listing, uplisting, and designation of critical habitat for imperiled species across the United States.  Among the many species the Center has fought to protect are the polar bear (*Ursus maritimus*), Gunnison sage-grouse (*Centrocercus minimus*), and Canada lynx (*Lynx canadensis*).  For each of these species, critical habitat opponents sought exclusions in order to continue developing and exploiting resources located on federal lands, and to preserve the

opportunity to do so in the future.  However, FWS rejected industry's speculative claims of remote and uncertain economic harms.

13.    In the case of the polar bear, FWS refused to exclude from polar bear critical habitat federal lands "in which oil and gas exploration, development, production, and transportation activities are occurring or are planned in the future." 75 Fed. Reg. 76,086, 76,097 (Dec. 7, 2010).  While critical habitat opponents predicted that designation would cost oil and gas producers billions of dollars, FWS rejected these estimates due to "uncertain[ty]." *See id.* at 76,105, 76,106. Ultimately, FWS determined that the "economic impacts associated with the designation" were neither "significant" nor "disproportionate." *Id.* at 76,127.  In the case of the Gunnison sage-grouse, FWS declined to exclude areas based on speculative future oil and gas development projections.  *See* 79 Fed. Reg. 69,312, 69,324, 69,346 (Nov. 20, 2014).  The snowmobile industry twice sought to nullify critical habitat designation for the Canada lynx in order to allow more snowmobile traffic in the lynx's essential habitat but was largely unsuccessful.  The Center intervened in one of these lawsuits to defend FWS's decision-making.  In a 2014 revision to the lynx's critical habitat, FWS again rejected unfounded claims that the designation would "result in disproportionate economic impacts to snowmobiling interests," and refused to exclude critical habitat.  79 Fed. Reg. 54,782, 54,829-830 (Sept. 12, 2014).  The polar bear, Gunnison sage-grouse, and

Canada lynx continue to face threats to their survival and recovery from projects seeking to develop and exploit the habitat that is essential to these species' conservation.

14.    The Center also regularly sues FWS to ensure timely compliance with ESA Section 4, including critical habitat designations.  The Center recently brought a successful lawsuit that concluded with entry of a court-approved stipulation directing FWS to designate critical habitat for fourteen endangered species some of which are found only on Hawai'i Island (12 plants, 1 anchialine pool shrimp, and 1 picture-wing fly), including the ko'oko'olau (*Bidens hillebrandiana ssp. Hillebrandiana*), hāhā (*Cyanea marksii*), 'aku (*Cyanea tritomantha*), and lo'ulu (*Pritchardia munroi*).  *See Ctr. for Biological Diversity v. Bernhardt et al.*, Civ. No. 1:19-cv-588 HG-KJM (D. Haw. filed Oct. 28, 2019) (stipulation for dismissal with prejudice).

15.    The Center also recently filed suit to enforce FWS's duty to designate critical habitat for the endangered Texas hornshell (*Popenaias popeii*).  *See Ctr. for Biological Diversity v. Bernhardt et al.,* Civ. No. 1:20-cv-00573-EGS (D.D.C. filed Feb. 27, 2020).  The Texas hornshell, a freshwater mussel historically found throughout the Rio Grande River in New Mexico, Texas, and Mexico, occurs in the United States in five isolated populations located in part on or near federal lands.  The primary threats to the species are degraded water quality, increased

9

sedimentation, loss of flowing water, and barriers to fish movement. The Texas hornshell's riparian habitat is threatened by oil and gas development, cattle grazing, and other polluting industries located along the rivers where the species is found.

16.     The Center is currently tracking and plans to comment on critical habitat designations for the Hawaiʻi Island species and the Texas hornshell once proposed. The Center expects that it will be obliged to use its limited resources during the critical habitat designation process to rebut speculative claims of economic impacts, which FWS now has the affirmative burden to disprove under the Mandatory Exclusion Rule. Debunking speculative claims diverts limited resources from the Center's primary mission to advance species conservation by focusing on the biological and nonbiological factors that favor critical habitat designation.

17.     The Center and its members rely on the designation of critical habitat to preserve and aid in the recovery of endangered plants and animals, including but not limited to the polar bear, Canada lynx, Gunnison sage-grouse, Hawaiʻi Island species, and Texas hornshell. The Center and its members derive substantial scientific, educational, recreational, commercial, cultural, spiritual, and aesthetic benefits from studying, observing, photographing, and enjoying these and other

10

imperiled species in their native ecosystems, and have specific intentions to continue to do so on an ongoing basis into the future.

18.    Plaintiff American Bird Conservancy ("ABC") is a non-profit membership organization with the mission of conserving native birds and their habitats throughout the Americas.  Among other strategies to protect and restore bird habitats and populations, ABC regularly provides comments on critical habitat designations for listed species with the goal of ensuring that FWS protects these species using the best available science regarding the species' biological needs.

19.    The Gunnison sage-grouse is one of the species that ABC has fought to protect.  The Gunnison sage-grouse is an iconic Western species that faces intense competition for use of its habitat as well as habitat fragmentation from urban sprawl, oil and gas development, and grazing.  There are currently seven populations left in the wild, occurring in Colorado and Utah.  Loss of sagebrush habitat across the species' historic range is the primary driver of the species' dramatic decline over the past century.  ABC submitted comments supporting critical habitat designation over a wide geographic area because the Gunnison sage-grouse needs to move throughout its territory on a seasonal basis for nesting, breeding, and wintering.  ABC also supports better public land management planning, and conservation initiatives on private lands, to help restore and recover habitat for this critically endangered species.

11

20.     ABC's members include avid birdwatchers, scientists, and members of the general public who share an interest in protecting the Gunnison sage-grouse, including by commenting on future revisions to the species' critical habitat designation.  ABC's members regularly study, photograph, and observe the Gunnison sage-grouse in its natural habitat for scientific, educational, recreational, commercial, and aesthetic purposes, and intend to do so as long as this species persists in the wild.

21.     Plaintiff Conservation Council for Hawaiʻi ("CCH"), is a non-profit citizens' organization based in Hawaiʻi with approximately 5,000 members in Hawaiʻi and throughout the United States mainland and foreign countries.  CCH is the Hawaiʻi affiliate of the National Wildlife Federation, a non-profit membership organization with over 5.8 million members and supporters nationwide.  CCH's mission is to protect native Hawaiian species, including threatened and endangered species, and to restore native Hawaiian ecosystems.

22.     For over 70 years, CCH has been foundational to conservation efforts in Hawaiʻi.  The protection of Hawaiʻi's endangered and threatened plants and animals, and of the habitat upon which they depend, is of particular concern to CCH.  In furtherance of these goals, CCH was the lead plaintiff in *Conservation Council for Hawaiʻi v. Lujan*, Civ. No. 89-953 ACK (D. Haw. filed Dec. 8, 1989) (resulting in a settlement pursuant to which FWS listed 187 taxa of Hawaiian

plants), *Conservation Council for Hawaiʻi et al. v. Babbitt*, 2 F. Supp. 2d 1280 (D. Haw. 1998) (finding arbitrary and capricious FWS's refusal to designate critical habitat for 245 taxa of endangered and threatened plants), and *Conservation Council for Hawaiʻi v. Babbitt*, Civ. No. 99-00283 HG (D. Haw. filed Apr. 20, 1999) (securing listing and critical habitat designation for ten plant taxa from Maui Nui).  When designating critical habitat for these species under court order, FWS repeatedly rejected speculative claims of economic harm made by critical habitat opponents.  *See, e.g.,* 68 Fed. Reg. 39,624, 39,640-41 (July 2, 2003) (rejecting allegedly "substantial costs associated with conservation management actions" on lands designated as critical habitat for imperiled Hawaiian plants as "not reasonably foreseeable"); *id.* at 39,643 (finding that "the methodology used by the commenter to derive the estimated economic impact of $390 million [from designation] is not consistent with the methodology presented in [FWS's draft economic analysis]").  During recent revisions to the critical habitat designations, FWS again rejected unsubstantiated and speculative claims of harm.  *See, e.g.,* 81 Fed. Reg. 17,790, 17,832 (Mar. 30, 2016) (rejecting alleged harm to ranching interests "due to the significant uncertainty surrounding the likelihood and potential magnitude of any such potential effects.").

23.    CCH's members rely on the designation of critical habitat to aid in the recovery of endangered and threatened Hawaiian plants and animals, including, but

not limited to, the hundreds of imperiled plant taxa across the State of Hawai'i for which CCH's advocacy secured critical habitat protection.  CCH's members hike, live and work in areas where these plant species grow, and they derive substantial scientific, educational, recreational, commercial, cultural, spiritual, and aesthetic benefits from studying, observing, photographing, and enjoying these and other imperiled species in the wild, and from advocating for these species' protection under the law.

24.    Plaintiff Defenders of Wildlife ("Defenders") is a non-profit conservation organization dedicated to the protection of all native animals and plants in their natural communities.  Defenders is incorporated and headquartered in Washington D.C., and has more than 1.4 million members and supporters located across the United States and its territories, including over 5,000 in the State of Hawai'i.  Defenders' mission is to protect native wild animals and plants in their natural communities.  Defenders has developed programs for combating species extinction, the loss of biological diversity, and habitat alteration and destruction. Defenders has long been involved in seeking to promote the protection and recovery of threatened and endangered species using the ESA.

25.    Defenders regularly provides comments on critical habitat designation proposals to ensure that the most biologically critical areas for imperiled species' survival and recovery are included in the final designations.  Defenders also

engages in litigation to ensure that FWS complies with the law and to defend critical habitat designations from challenges by industry opponents and others. Among the many species Defenders has fought to protect are the polar bear, Gunnison sage-grouse, and Canada lynx. In designating critical habitat for each of these species, FWS rejected speculative claims of economic harm, as described above. In the case of the polar bear, Defenders intervened in a legal challenge filed by oil and gas interests and successfully defended FWS's decision to include federal lands in the critical habitat designation. *See Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544 (9th Cir. 2016). Although FWS has designated critical habitat for these species consistent with their recovery needs in the past, the polar bear, Gunnison sage-grouse, and Canada lynx continue to face threats from ongoing development and exploitation of their native ecosystems.

26.     Defenders is currently tracking and plans to comment on forthcoming critical habitat designations for the red knot (*Calidris canutus*), lesser prairie chicken (*Tympanuchus pallidicinctus*), and the Sierra Nevada fox (*Vulpes necator*). Defenders expects that it will be obliged to use its limited resources during the critical habitat designation process to rebut speculative claims of economic impacts, which FWS now has the affirmative burden to disprove under the Mandatory Exclusion Rule. Debunking speculative claims of harm diverts limited resources from Defenders' primary mission to advance species

conservation by focusing on the biological and nonbiological factors that favor critical habitat designation.

27.    Defenders' staff and members rely on the designation of critical habitat to preserve and aid in the recovery of endangered plants and animals including, but not limited to, the polar bear, Gunnison sage-grouse, Canada lynx, red knot, lesser prairie chicken, and the Sierra Nevada fox.  Defenders' members derive substantial scientific, recreational, commercial, and aesthetic benefits from studying, observing, photographing, and enjoying these and other imperiled species in the wild.  Defenders' members will continue to advocate for the protection of these species and visit the habitats and ecosystems that allow for these species' continued survival.

28.    Plaintiff National Parks Conservation Association ("NPCA") is a nonprofit environmental group founded in 1919 as a leading voice for America's national parks.  NPCA is headquartered in Washington, D.C., and has 27 regional and field offices throughout the country, including the Pacific Regional Field Office, which focuses on protecting national parks and their resources in Hawaiʻi and elsewhere in the Pacific region.  NPCA and its nearly 1.4 million members and supporters work together to protect and preserve our nation's most iconic and inspirational places for future generations.  Over 600 listed species are found in the

national parks system, including in Haleakalā National Park and Volcanoes National Park, both of which are located in the State of Hawaiʻi.

29.     In 2019, NPCA formally established its first national program dedicated exclusively to the conservation of wildlife in national parks.  The program  engages NPCA's members and allies to obtain long-term protections for park wildlife, and to support the recovery of threatened and endangered species in national park landscapes.  To reach these goals, NPCA drafts comments on critical habitat, federal and state wildlife management, and wildlife regulations.

30.     NPCA's members rely on critical habitat protections to aid in the recovery of imperiled species that live on and around national park system lands, such as the New Mexico meadow jumping mouse (*Zapus hudsonius luteus*) (the "New Mexico jumping mouse").  The mouse is currently found only in a few dozen isolated populations, two of which are located on Redondo Creek in Valles Caldera National Preserve, a unit of the national park system that NPCA's members regularly visit.  As discussed below, the mouse's recovery is threatened by grazing on federal lands, with ranchers holding federal grazing allotments seeking to strip critical habitat protection from habitat that is essential for the species' conservation.  NPCA's members derive scientific, educational, recreational, commercial, cultural, spiritual, and aesthetic benefits from observing,

17

studying, conserving, and photographing imperiled species like the New Mexico jumping mouse on national park system lands.

31.     Plaintiff Natural Resources Defense Council ("NRDC"), is a non-profit membership corporation founded in 1970 and organized under the laws of the State of New York.  NRDC has more than 420,000 members nationwide, and over 2,200 members in Hawai'i.  NRDC's mission is to safeguard the earth - its people, its plants and animals, and the natural systems on which all life depends.

32.     NRDC has long been active in efforts to protect endangered species and regularly engages in advocacy and litigation to secure ESA protections for imperiled species threatened with extinction.  One such example is the polar bear. NRDC sued FWS multiple times to secure listing for the species, and, in 2008, secured a court order requiring that FWS make a final listing decision for the polar bear in a timely manner. *See Ctr. for Biological Diversity v. Kempthorne*, Civ. No. C 08-1339 CW, 2008 WL 1902703, at *3 (N.D. Cal. Apr. 28, 2008). Subsequently, FWS listed the polar bear as threatened based on the  fact "that polar bear habitat—principally sea ice—is declining throughout the species' range."  73 Fed. Reg. 28,212 (May 15, 2008).  During the critical habitat designation process, NRDC submitted extensive comments focused on the biological needs of the species, including identifying additional denning habitat along the Northern Alaska

coast, and advocating that FWS expand the geographic scope of protected sea ice habitat to encompass the exclusive economic zone.

33.   NRDC remains engaged in and committed to protecting the polar bear and its critical habitat from destructive oil and gas and other development projects. NRDC has members who study and photograph the polar bear, and depend on its continued survival for scientific, commercial, spiritual, and aesthetic purposes. NRDC will continue to monitor the polar bear's status under the ESA and fight for protection of the bear's critical habitat.

34.   Plaintiff Sierra Club is a national nonprofit organization with 67 chapters and about 830,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Hawaiʻi Chapter of the Sierra Club has over 4,600 members.

35.   Among other advocacy to protect imperiled species, Sierra Club successfully sued FWS for arbitrarily failing to designate critical habitat for 245 taxa of endangered and threatened Hawaiian plants. *See Conservation Council for Hawaiʻi, et al. v. Babbitt*, 2 F. Supp. 2d 1280 (D. Haw. 1998).  As a result of the Sierra Club's advocacy, FWS designated critical habitat for hundreds of

19

endangered and threatened plant taxa across the State of Hawaiʻi, all of which are endemic to the Hawaiian Islands.  As described above, FWS repeatedly rejected specious claims of economic harm made by critical habitat opponents during the designation process for protected Hawaiian plant species.  In addition to advocating on behalf of endemic Hawaiian plants, Sierra Club has been involved in multiple lawsuits to protect lynx critical habitat from challenges brought by the snowmobiling industry.  FWS most recently rejected the snowmobiling industry's estimates of economic harm in Washington State as unfounded.  *See* 79 Fed. Reg. at 54,829

36.     Sierra Club and its members regularly advocate for imperiled species and for the conservation and protection of the ecosystems upon which these species rely and they will continue to do so on an ongoing basis in the future. Sierra Club's members rely on the protection that critical habitat provides to aid in the recovery of imperiled species, including, but not limited to, listed Hawaiian plant species and the Canada lynx, that members frequently observe, study, and photograph for scientific, educational, recreational, commercial, cultural, spiritual, and aesthetic purposes.

37.     Plaintiff WildEarth Guardians ("Guardians") is a non-profit membership organization with over 175,000 members and supporters with the shared mission of protecting threatened and endangered species and their habitats.

Guardians uses science and environmental laws to protect and restore the wildlife, wild places, wild rivers, and health of the American West.  In particular, Guardians advocates for the protection and restoration of endangered and threatened species and their habitats throughout the Western United States.

38.     Among the many species Guardians has helped to protect is the New Mexico meadow jumping mouse.  The New Mexico jumping mouse lives in riparian grasslands that have been severely degraded throughout its historical range due to cattle grazing.  In October 2008, Guardians filed an ESA petition to list the mouse as an endangered species, and, in 2011, entered a settlement agreement that successfully obtained listing for the species.  Subsequently, Guardians was instrumental in ensuring that thousands of acres identified as critical to the mouse's survival and recovery were not excluded from critical habitat designation due to specious claims of economic harm from ranching interests that use federal lands to graze cattle.  In addition to submitting extensive comments on the mouse's biological needs, Guardians subsequently intervened in litigation initiated by two cattlemen's associations challenging FWS's refusal to exclude grazing allotments from critical habitat.  Recently, the District Court for the District of New Mexico upheld FWS's decision.  *See Northern New Mexico Stockman's Association et al. v. U.S. Fish & Wildlife Serv.*, Civ. No. 18-1138 JB\JFR, 214-15 (D.N.M. Oct. 13,

2020).  Despite this victory, the New Mexico jumping mouse continues to face threats to its habitat from ranching interests.

39.    Guardians' members and staff regularly visit, study, work, and recreate in areas where the New Mexico jumping mouse lives, and they have specific intentions to continue to do so frequently and on an ongoing basis in the future.  Guardians' members and staff derive scientific, educational, recreational, commercial, spiritual, cultural, and aesthetic benefits from viewing, observing, photographing, studying, researching, and conserving this species in the wild.

40.    Plaintiffs bring this lawsuit on behalf of themselves and their adversely affected members and staff.  Plaintiffs and their members have a concrete interest in FWS's lawful implementation of the ESA's critical habitat provisions because of the vital role that critical habitat plays in preventing harm to, and promoting the recovery of, imperiled wildlife.  The Mandatory Exclusion Rule harms Plaintiffs by stacking the deck against the designation and protection as critical habitat of biologically significant areas that are essential to ESA-listed species' conservation.  The Mandatory Exclusion Rule will preclude FWS from exercising its discretion to make designations, and exclusions, on a case-by-case basis, as necessary to protected imperiled species.  The Mandatory Exclusion Rule will further preclude FWS from exercising its discretion not to exclude areas from critical habitat designation on the basis of speculative claims of harm.  Finally, the

22

Mandatory Exclusion will remove the presumption favoring critical habitat designation on federal lands, where critical habitat confers its greatest benefits. Given that the Services routinely revise existing critical habitat designations (either *sua sponte* or in response to petitions), the currently designated critical habitat that Plaintiffs have worked so hard to protect is now at imminent risk of being stripped of vital protection.

41.    In addition to harming and risking harm to the concrete interests of Plaintiffs' members, Mandatory Exclusion Rule harms the operations and core missions of the plaintiff organizations themselves.  For example, the Mandatory Exclusion Rule shifts the burden to FWS to affirmatively disprove speculative claims of economic harm made by opponents of critical habitat designation.  This likewise shifts the burden to Plaintiffs to expend their own resources to hire experts to place evidence in the record that can affirmatively disprove any variety of speculative claims of economic harm that critical habitat opponents routinely make.  This focus on speculative economic harms will divert Plaintiffs' resources away from their core focus on obtaining biologically significant protections for species at grave risk of extinction, including designation of areas essential to the conservation of listed species as critical habitat.  By reducing critical habitat designation and protection for biologically significant areas, the Mandatory

Exclusion Rule also directly impedes Plaintiffs' core missions to protect imperiled species.

42.     Additionally, Plaintiffs and their members' concrete interests are injured by FWS's failure to evaluate the environmental effects of the Mandatory Exclusion Rule under NEPA.

43.     The ESA expressly declares that endangered and threatened "species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people."  16 U.S.C. § 1531(a)(3).  The harms that would result from the loss of biological diversity are enormous, and the nation cannot fully apprehend their scope because of the "*unknown* uses that endangered species might have and … the *unforeseeable* place such creatures may have in the chain of life on this planet."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 178-79 (1978) (emphases in original); *see also id.* at 178 (the value of this genetic heritage is "quite literally, incalculable").  The recreational, scientific, commercial, aesthetic, cultural, and spiritual interests of these groups and their members in threatened and endangered species and their critical habitat have been, are being, and, unless the relief prayed for is granted, will continue to be directly and adversely affected by Defendants' failure to comply with the law.

DEFENDANTS

44.     Defendant David Bernhardt is sued in his official capacity as

Secretary of the United States Department of the Interior.  Secretary Bernhardt has

responsibility for implementing and fulfilling the duties of the United States

Department of the Interior, including the administration of the ESA with regard to

threatened and endangered terrestrial and freshwater plant and animal species.

45.     Defendant U.S. Fish and Wildlife Service is the agency within the

United States Department of the Interior responsible for administering the ESA.


## BACKGROUND

### DESIGNATING CRITICAL HABITAT IS KEY TO ACHIEVING THE ESA'S GOAL TO RECOVER ENDANGERED AND THREATENED SPECIES

46.     When Congress enacted the ESA in 1973, it understood that habitat

protection was key to saving species from extinction and allowing for their

eventual recovery:

> Man can threaten the existence of species of plants and animals in any
> of a number of ways. … The most significant of those has proven also
> to be the most difficult to control: the destruction of critical habitat. ...
> There are certain areas which are critical which can and should be set
> aside. It is the intent of this legislation to see that our ability to do so,
> at least within this country, is maintained.

H.R. Rep. No. 93-412, at 5 (1973).

47.    Consistent with that understanding, Congress identified as the first of the ESA's purposes "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved."  16 U.S.C. § 1531(b).

48.    ESA Section 4, 16 U.S.C. § 1533, requires the listing of species as endangered or threatened when they meet the statutory listing criteria.  Further evidencing Congress's understanding of habitat's vital role in species conservation, the first listing criterion is "the present or threatened destruction, modification, or curtailment of [the species'] habitat or range."  *Id.* § 1533(a)(1)(A).

49.    Once a species is listed, various safeguards apply to prevent activities that will cause harm to members of the species or that will jeopardize the species' survival and recovery.  Foremost among these is ESA Section 7's prohibition on federal agency actions that are "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical."  *Id.* § 1536(a)(2).

50.    Critical habitat is defined under the ESA to include both:

(i)    the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

26

(ii)    specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

*Id.* § 1532(5)(A).

51.    "Conservation" is defined broadly to include "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," that is, when the species have recovered and no longer need the ESA's protection.  *Id.* § 1532(3).

52.    The ESA establishes an interagency consultation process to assist federal agencies in complying with their duty to avoid jeopardy to listed species or destruction or adverse modification of critical habitat.  *See generally id.* § 1536; 50 C.F.R. §§ 402.13, 402.14.  Briefly stated, once an agency enters formal consultation with FWS (for terrestrial species) regarding a proposed course of action, FWS must prepare a biological opinion to evaluate the action's effects.  If FWS determines the action is likely to "jeopardize the species" or destroy or adversely modify its critical habitat, FWS must issue a "jeopardy biological opinion," that includes "reasonable and prudent alternatives" that can avoid the harm.  50 C.F.R. § 402.14(h)(1)(iv), (2).

53.     If FWS cannot develop a reasonable and prudent alternative that is acceptable to the agency proposing the action and any third-party applicant involved in the action, the jeopardy biological opinion generally prohibits the action from moving forward.

54.     Critical habitat designation provides additional benefits to listed species beyond the prohibition against actions that jeopardize their continued survival, because critical habitat provides for the "conservation" needs of the species, 16 U.S.C. § 1532(5)(A)(i), (ii), defined broadly to include recovery goals. *Id.* § 1532(3); *see also Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004).  Critical habitat designation is, therefore, designed to provide the additional benefit of assisting in the recovery of listed species, as well as to alert the public and agency decisionmakers to the importance of these designated areas for conservation activities.

55.     In 1976, Congress reiterated the distinct importance of critical habitat and the prohibition on adverse modification:

> It is the Committee's view that classifying a species as endangered or threatened is only the first step in insuring its survival.  Of equal or more importance is the determination of the habitat necessary for that species' continued existence.  Once a habitat is so designated, the Act requires that proposed federal actions not adversely affect the habitat. If the protection of endangered and threatened species depends in large measure on the preservation of the species' habitat, then ***the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitat***.

H.R. Rep. No. 94-887, at 3 (1976) (emphasis added).

56.     For the ESA's first five years, FWS was authorized, but not obliged, to designate critical habitat.  Congress amended the ESA in 1978 to require that, at the time a species is listed as endangered or threatened, FWS generally must also "concurrently … designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i).

57.     In making critical habitat designation mandatory, Congress reaffirmed that "[t]he loss of habitat for many species is universally cited as the major cause for the extinction of species worldwide." H.R. Rep. No. 95-1625, at 5, *as reprinted in* 1978 U.S.C.C.A.N. 9453, 9455.

### FOR DECADES, FWS HAS UNDERSTOOD THAT ESA SECTION 4(B)(2) GRANTS BROAD DISCRETION TO DESIGNATE CRITICAL HABITAT ON A CASE-BY-CASE BASIS TO PROTECT SPECIES AND THAT EXCLUSION OF PARTICULAR AREAS FROM CRITICAL HABITAT IS NEVER REQUIRED

58.     ESA Section 4(b)(2) reads in full:

The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) ***on the basis of the best scientific data available*** and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of ***specifying any particular area as critical habitat***. The Secretary ***may exclude any area from critical habitat*** if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

16 U.S.C. § 1533(b)(2) (emphasis added).

59.     In 1980, FWS and NMFS promulgated joint regulations to implement the ESA's critical habitat provisions, including ESA section 4(b)(2)'s mandatory impacts analysis and discretionary exclusion analysis.  *See* 50 C.F.R. § 424.12 (1980); 45 Fed. Reg. 13,010. (Feb. 27, 1980).

60.     The 1980 regulation stated in relevant part that the Services "shall consider the reasonably probable economic and other impacts of the designation upon such activities."  50 C.F.R. § 424.12(c) (1980); 45 Fed. Reg. at 13,023. Tracking the statutory language, the regulation also provided that the Services "***may*** exclude any such area from the Critical Habitat if [FWS or NMFS] determines that the benefits of such exclusion outweigh the benefits of specifying the area as part of the Critical Habitat."  50 C.F.R. § 424.12(c) (1980) (emphasis added); *see also* 45 Fed. Reg. at 13,023.

61.     In 1984, FWS and NMFS amended the critical habitat regulations, moving the nonbiological impacts and discretionary exclusion analyses to a subsection that was separate from the one governing the identification, based on the best scientific data available, of areas that qualify as critical habitat.  *See* 50 C.F.R. § 424.19 (1984); 49 Fed. Reg. 38,900 (Oct. 1, 1984).  The rationale was to "keep separate the biological and economic considerations" of designating critical

habitat. 49 Fed. Reg. at 38,907. The language implementing ESA Section 4(b)(2) was not changed in any material way.

62. In 2013, FWS and NMFS amended the joint regulations to provide that the Services would publish a draft economic analysis concurrently with publication of a proposed critical habitat designation. *See* 50 C.F.R. § 424.19(a) (2013); 78 Fed. Reg. 53,058 (Aug. 28, 2013). This amendment changed the timing of making this document available to the public (at the beginning rather than the end of the critical habitat designation process) to facilitate public comment on the Services' analysis of the economic impacts of designation. *See* 78 Fed. Reg. at 53,058. In publishing the 2013 amendments, the Services noted that "a draft economic analysis of a critical habitat designation is only one of many pieces of information the Secretaries use in determining whether to exclude areas under section 4(b)(2) of the Act, *if the Secretary decides to engage in that discretionary analysis.*" *Id.* at 53,061 (emphasis added).

63. The 2013 amendments made clear the broad sweep of the Services' discretion to "consider impacts at a scale that the [agency] determines to be appropriate[,]" 50 C.F.R. § 424.19(b), and to "assign the weight given to any benefits relevant to the designation of critical habitat." *Id.* § 424.19(c). These additional revisions served to "codify the current practices of the agencies." 78 Fed. Reg. at 53,059.

64.     In 2016, FWS and NMFS published a final policy to further explain how the Services conduct their discretionary exclusion analyses (the "2016 Policy").  *See* 81 Fed. Reg. 7,226 (Feb. 11, 2016).  As stated in the Federal Register, after (1) implementing "the biologically driven first step of identifying 'critical habitat' for a species" and (2) engaging in the mandatory impacts analysis, the Act (3) "provides a mechanism that allows the Secretaries to exclude particular areas only upon a determination that the benefits of exclusion outweigh those of inclusion, so long as the exclusion will not result in the extinction of the species concerned."  *Id.* at 7,228.

65.     The 2016 Policy emphasizes that "[n]either the Act nor the implementing regulations at 50 CFR 424.19 require the [Services] to conduct a discretionary 4(b)(2) exclusion analysis" and that the Services have "discretion as to what factors to consider as benefits of inclusion and benefits of exclusion, and what weight to assign to each factor—nothing in the Act, its implementing regulations, or this policy limits this discretion."  *Id*.

66.     After setting forth these basic principles, the 2016 Policy provides that the Services will prioritize designation of critical habitat on federal lands, and "focus our exclusions on non-Federal lands."  *Id.* at 7,232.  The policy recognizes the high conservation value of designating federal lands because of the affirmative duty ESA Section 7 places on federal agencies to "utilize their authorities in

furtherance of the purposes" of the Act and to "insure" that any actions authorized, funded, or carried out by a federal agency do not destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(1), (2); *see* 81 Fed. Reg. at 7,231.

67.     The joint regulation implementing ESA section 4(b)(2), 50 C.F.R. § 424.19(b), and the 2016 Policy interpreting the regulation, remain in effect for NMFS.

THE MANDATORY EXCLUSION RULE PRIORITIZES THE ECONOMIC
DEVELOPMENT OF HABITAT OVER THE PROTECTION OF SPECIES

68.     On September 8, 2020, FWS proposed the Mandatory Exclusion Rule, which flips the ESA on its head by giving nonfederal entities with an interest in preventing critical habitat designation—invariably for the purpose of developing, exploiting, and thus destroying the biological features that make the habitat capable of promoting the continued survival and eventual recovery of imperiled species— a determinative role in FWS's discretionary exclusion analysis. *See* 81 Fed. Reg. 55,398 (Sept. 8, 2020).

69.     Plaintiffs submitted extensive comments detailing how the rule violates the ESA's mandate to prioritize the protection and recovery of imperiled species. Plaintiffs also detailed why the Mandatory Exclusion Rule is not exempt from NEPA analysis. Nonetheless, on December 18, 2020, FWS promulgated the Mandatory Exclusion Rule with the same defects Plaintiffs raised in their comment

letters.  *See generally* 85 Fed. Reg. 82,376.  The Mandatory Exclusion Rule takes

effect on January 19, 2021.  *Id.* at 82,376.

70.    First, the Mandatory Exclusion Rule requires that FWS conduct an

exclusion analysis whenever a "proponent of excluding a particular area (including

but not limited to permittees, lessees or others with a permit, lease, or contract on

federally managed lands) has presented credible information regarding the

existence of a meaningful economic or other relevant impact supporting a benefit

of exclusion for that particular area."  *Id.* at 82,388 (to be codified at 50 C.F.R. §

17.90(c)(2)(i)).  This requirement eliminates FWS's discretion whether to conduct

an exclusions analysis in the first place.

71.    The regulation does not define "credible information."  However, the

Federal Register notice states that the term "refers to information that constitutes a

reasonably reliable indication regarding the existence of a meaningful economic or

other relevant impact supporting a benefit of exclusion for a particular area."  *Id.* at

82,380.  This vague standard sets an unreasonably low bar, with virtually any

alleged impact triggering FWS's obligation to conduct an exclusion analysis that

the statute makes entirely discretionary.

72.    Oil and gas exploration, logging, mining, and ranching interests are

examples of entities that hold federal permits, leases or contracts for the extraction

and use of natural resources located on federal lands, and who regularly advocate

that FWS exclude vast swaths of critical habitat from final designations because of alleged economic impacts.  Other proponents of critical habitat exclusions may include State agencies, municipalities, and private landowners.

73.    Second, the Mandatory Exclusion Rule states that, for a non-exclusive list of areas "outside the scope of [FWS's] expertise," the agency must weigh the benefits of inclusion or exclusion "consistent with the expert or firsthand information" received from those commenting on a proposed designation "unless [FWS] has knowledge or material evidence that rebuts that information." *Id.* at 82,388-89 (to be codified at 50 C.F.R. § 17.90(d)(1)).

74.    The Mandatory Exclusion Rule broadly defines most nonbiological impacts as lying "outside the scope" of FWS's expertise, including, but not limited to, any and all "[n]onbiological impacts identified by a permittee, lessee, or contractor applicant for a permit, lease, or contract on Federal lands." *Id.* at 82,389 (to be codified at 50 C.F.R. § 17.90(d)(1)(iv)).

75.    In sum, after an opponent of designation has triggered the exclusion analysis by identifying a benefit of exclusion, FWS must "give weight to those benefits consistent with [that] information", unless FWS musters "material evidence that rebuts that information." *Id.* at 82,388-89 (to be codified at 50 C.F.R. § 17.90(d)(1)).  In the past, consistent with the plain language of ESA section 4(b)(2), FWS has dismissed out of hand speculative or otherwise

35

unsupported claims by critical habitat opponents that designation would impose

exorbitant economic costs.  Now, under the Mandatory Exclusion Rule, FWS must

defer to the very same speculative claims it historically rejected, unless FWS can

affirmatively rebut them.

76.     Finally, the Mandatory Exclusion Rule categorically requires that

FWS exclude areas from critical habitat whenever the benefits of exclusion

outweigh the benefits of inclusion.  *Id.* at 82,389 (to be codified at 50 C.F.R. §

17.90(e).  The regulation deprives FWS of its statutorily conferred discretion to

tailor its decision-making to a species' unique circumstances on a case-by-case

basis and to designate particular areas as critical habitat regardless of the impacts

of designation.

77.     The Mandatory Exclusion Rule thus establishes a rebuttable

presumption in favor of stripping critical habitat protection from areas that the best

available science has identified as essential for a listed species' conservation,

including habitat that is located on federal lands, whenever those areas have been

targeted for development, extraction and exploitation.  This flips on its head

Congress's policy of "institutionalized caution," affording "the highest of

priorities" to those seeking to destroy essential recovery habitat rather than to the

endangered and threatened species whose conservation depends on that habitat and

for whose benefit Congress enacted the ESA.  *Tenn. Valley Auth.*, 437 U.S. at 174.

78.     FWS provided no valid justification for this radical change in how the agency performs its discretionary exclusion analysis, stating merely its intent "to provide greater transparency and certainty for the public and stakeholders." 81 Fed. Reg. at 55,398; 85 Fed. Reg. at 82,376.

79.     FWS's stated rationale is both logically unsound and contrary to congressional intent in mandating critical habitat designation.  Since the Services first promulgated their joint regulations in 1980, FWS provided transparency to the public by publishing a critical habitat proposal, soliciting public comment on the impacts of the designation, and responding to comments—including requests for exclusion—in the Federal Register notice for the final critical habitat designation. Further, FWS has long made its economic analysis, which addresses the most controversial impact of designation, available for public review.  FWS more recently made that analysis available at the time of publishing a critical habitat proposal to allow direct public comment and rebuttal to the analysis.  Placing the burden on FWS to affirmatively rebut dubious claims of harm does not increase transparency beyond the prior notice and comment procedures established by the joint regulations.  It does, however, stack the deck against critical habitat designation, harming the imperiled species the ESA was enacted to protect.

80.     Providing "certainty" that logging, mining, ranching and other interests will be able to develop, exploit and destroy habitat that the best available

science identifies as essential for species conservation is not a legally permissible rationale for rulemaking under the ESA.

81.     When it enacted the ESA, Congress made a specific finding that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation." 16 U.S.C. § 1531(a). To counteract this alarming trend, Congress required that critical habitat decisions be based on "the best scientific data available," 16 U.S.C. § 1533(b)(2). Congress imposed this requirement to "give the benefit of the doubt to the species[,]" H.R. Conf. Rep. No. 96-697, at 12, *as reprinted in* 1979 U.S.C.C.A.N. 2572, 2576, and "to halt and reverse the trend toward species extinction, ***whatever the cost***." *Tenn. Valley Auth.*, 437 U.S. at 174 (emphasis added). Prioritizing the concerns of development interests over the protection of imperiled species is directly contrary to the goals and purposes of the Act.

82.     FWS did not analyze the impacts of the Mandatory Exclusion Rule under NEPA before promulgating the final rule. Instead, FWS relied upon a categorical exclusion under 43 C.F.R. § 46.210(i) for "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature.'' 85 Fed. Reg. at 82,388.

<u>CLAIMS FOR RELIEF</u>

<u>FIRST CLAIM FOR RELIEF</u>

(VIOLATION OF THE ENDANGERED SPECIES ACT AND
ADMINISTRATIVE PROCEDURE ACT: THE MANDATORY EXCLUSION
RULE IS CONTRARY TO LAW)

83.     Plaintiffs reallege and incorporate by this reference each and every

allegation set forth in this Complaint.

84.     Under the APA, a "reviewing court shall … hold unlawful and set

aside" federal agency action found to be "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in

excess of statutory jurisdiction, authority, or limitations, or short of statutory

right," *id.* § 706(2)(C).  An agency does not have authority to adopt a regulation

that is "arbitrary, capricious, or manifestly contrary to the statute."  *Chevron*

*U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

85.     The Mandatory Exclusion Rule is manifestly contrary to the text and

purposes of the ESA.  In order to protect imperiled species, the ESA mandates that

FWS designate critical habitat at the time of listing a species, "to the maximum

extent prudent and determinable."  16 U.S.C. § 1533(a)(3).  The ESA further

mandates that FWS make critical habitat designations "on the basis of the best

scientific data available . . . after taking into consideration the economic impact,

the impact on national security, and any other relevant impact of specifying any

particular area as critical habitat." *Id.* § 1533(b)(2). To provide for "the conservation of the species," critical habitat may include both occupied and unoccupied areas. *Id.* § 1532(5)(A)(i), (ii).

86.    The ESA's command that FWS must consider the costs and benefits "of specifying ***any particular area*** as critical habitat" reflects congressional intent that FWS make individualized designation decisions, based on the specific facts relevant to the species under consideration. *Id.* § 1533(b)(2) (emphasis added). Moreover, Congress's deliberate choice of "may" rather than "shall" before "exclude" makes clear that Congress intended for the Secretary to retain the discretion to designate a "particular area as critical habitat" for an imperiled species, even where the evidence before the Secretary at the time of designation indicates that the costs of designating that "particular area" outweigh the benefits. *Id.*

87.    The Mandatory Exclusion Rule unlawfully rewrites the statute, replacing "may exclude" with "shall exclude." *See* 85 Fed. Reg. at 82,389 (to be codified at 50 C.F.R. § 17.90(e)). In place of the individualized determinations that Congress mandated regarding whether "any particular area" should be designated as critical habitat for the specific species under consideration, 16 U.S.C. § 1533(b)(2), FWS substitutes a blanket rule—applicable to all future designation decisions—that requires FWS automatically to exclude an area from critical habitat

40

if it deems the benefits of exclusion to outweigh the benefits of inclusion, regardless of circumstances.  The ESA's statutory text is not susceptible to this regulatory construction, which illegally deprives FWS of its discretion to tailor its decision-making to a species' unique circumstances, contravening congressional intent to afford imperiled species "the highest of priorities."  *Tenn. Valley Auth.*, 437 U.S. at 174.

88.    FWS's promulgation of the Mandatory Exclusion Rule purporting to implement ESA Section 4(b)(2) is arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF

### (VIOLATION OF THE ENDANGERED SPECIES ACT AND ADMINISTRATIVE PROCEDURE ACT:  THE MANDATORY EXCLUSION RULE ILLEGALLY DELEGATES FWS'S STATUTORY DUTIES TO CRITICAL HABITAT OPPONENTS)

89.    Plaintiffs reallege and incorporate by this reference each and every allegation set forth in this Complaint.

90.    Delegation of authority that Congress vests in an agency "to outside parties [is] assumed to be improper absent an affirmative showing of congressional authorization."  *United States Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004).  Delegation occurs where an agency abdicates final reviewing authority or merely acts as a "rubber stamp" for outside information received from other

parties. *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation of State of Montana*, 792 F.2d 782, 793 (9th Cir. 1986).

91.     As discussed above, the Mandatory Exclusion Rule illegally delegates to outside, nonfederal parties the authority to determine (1) when FWS must conduct an exclusion analysis, *see* 85 Fed. Reg. at 82,388 (to be codified at 50 C.F.R. § 17.90(c)(2)(i)), as well as (2) the "weight" FWS must assign to "the benefits of including or excluding any particular area" whenever alleged impacts involve a broad range of "areas that are outside the scope of [FWS's] expertise." *Id.* at 55,407 (to be codified at 50 C.F.R. § 17.90(d)(1)).  FWS's promulgation of the Mandatory Exclusion Rule purporting to implement ESA Section 4(b)(2) is thus arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

## THIRD CLAIM FOR RELIEF

### (VIOLATION OF THE ENDANGERED SPECIES ACT AND ADMINISTRATIVE PROCEDURE ACT: THE MANDATORY EXCLUSION RULE ARBITRARILY REVERSES THE JOINT IMPLEMENTING REGULATIONS)

92.     Plaintiffs reallege and incorporate by this reference each and every allegation set forth in this Complaint.

93.     When promulgating regulations, FWS must articulate a satisfactory explanation for its action, including a rational connection between the facts found

and the choices made.  A regulation is arbitrary and capricious under the APA

where "the agency has relied on factors which Congress has not intended it to

consider, entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or

is so implausible that it could not be ascribed to a difference in view or the product

of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

94.     Further, when an agency issues a regulation changing or amending a

prior regulation, it faces a high burden.  The agency must demonstrate that (1) the

new rule is permissible under the statute; (2) there are good reasons for it; (3) the

agency believes it to be better; and (4) the agency displays awareness that it is

changing its position.  Any unexplained inconsistency between the prior rule and

its replacement is a basis for finding the agency's interpretation arbitrary and

capricious.

95.     The Mandatory Exclusion Rule supersedes the joint regulations

affirming FWS's absolute discretion whether to conduct an exclusion analysis, *see*

85 Fed. Reg. at 82,376, replacing it with a mandate that FWS conduct an exclusion

analysis whenever a critical habitat opponent "present[s] credible information

regarding the existence of a meaningful economic or other relevant impact

supporting a benefit of exclusion for that particular area." *Id.* at 82,388 (to be codified at 50 C.F.R. § 17.90(c)(2)(i)).

96.     The Mandatory Exclusion Rule further requires FWS, for a broad range of areas "outside the scope of the Service's expertise," to weigh the benefits of inclusion or exclusion "consistent with the expert or firsthand information" received from those commenting on a proposed designation, unless FWS can affirmatively "rebut[] that information." *Id.* at 82,388-89 (to be codified at 50 C.F.R. § 17.90(d)(1)).  This reverses the joint regulations, which had affirmed FWS's broad discretion to "assign the weight given to any benefits relevant to the designation of critical habitat."  50 C.F.R. § 424.19(c).

97.     Finally, the Mandatory Exclusion Rule commands that FWS "shall" exclude any area from critical habitat designation if the agency determines that the benefits of exclusion outweigh the benefits of inclusion, 85 Fed. Reg. at 82,389 (to be codified at 50 C.F.R. § 17.90(e)), in direct contravention of the joint regulations, which recognize that the ESA gives FWS broad discretion to decide whether to "exclude any particular area from the critical habitat," regardless of impacts.  50 C.F.R. § 424.19(c).

98.     In promulgating the Mandatory Exclusion Rule, FWS fails to justify its decision to reverse longstanding regulations, a decision that is not based on the best available science, as required by the ESA.  FWS did not explain how the

Mandatory Exclusion Rule advances the conservation purposes of the ESA or benefits endangered and threatened species. Nor could it. In fact, FWS's abandonment of 50 C.F.R. § 424.19 and adoption of the Mandatory Exclusion Rule serves only to skew FWS's implementation of the ESA's critical habitat provisions in favor of stripping vital protections from habitat that is essential for imperiled species' conservation when critical habitat opponents seek to develop and exploit those ecosystems.

99.    FWS's failure to articulate a rational connection between the facts found and the choice made or to provide an adequate and detailed justification for replacing the joint regulations' provisions on critical habitat exclusions renders FWS's decision arbitrary, capricious, an abuse of discretion, and not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

FOURTH CLAIM FOR RELIEF

(VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: THE
MANDATORY EXCLUSION RULE ARBITRARILY REVERSES THE 2016
POLICY REGARDING FEDERAL LANDS)

100.    Plaintiffs reallege and incorporate by this reference each and every allegation set forth in this Complaint.

101.    A policy change complies with the APA if the agency demonstrates that (1) the policy change is permissible under the statute; (2) there are good reasons for the policy change; (3) the agency believes the new policy to be better;

45

and (4) the agency displays awareness that it is changing its position.  Any unexplained inconsistency between the prior policy and its replacement is a basis for finding the agency's interpretation arbitrary and capricious.

102.   The Mandatory Exclusion Rule "revers[es] the 2016 Policy's prior position that [FWS] generally do[es] not exclude Federal lands" from critical habitat designations.  81 Fed. Reg. at 55,402; *see also* 85 Fed. Reg. at 82,382 (acknowledging agency's "change in consideration of exclusions of Federal lands from the 2016 Policy").  FWS did not provide any rational basis for reversing this aspect of the 2016 Policy.  The FWS merely noted that "section 4(b)(2) of the Act does not provide for a different standard for exclusions on Federal lands relative to other lands."  85 Fed. Reg. at 82,382.

103.   This stated rationale does not address the factual predicate underlying the 2016 Policy, namely the high conservation value of designating critical habitat on federal lands because of the affirmative duty ESA Section 7 places on federal agencies to "utilize their authorities in furtherance of the purposes" of the Act and to "insure" that any actions authorized, funded, or carried out by a federal agency do not destroy or adversely modify critical habitat.  16 U.S.C. § 1536(a)(1), (2).

104.   Further, FWS failed to explain how reversing the 2016 Policy will further the ESA's conservation purposes or otherwise benefit endangered and threatened species.  In fact, the Mandatory Exclusion Rule will reverse the

46

presumption of protecting federal lands as critical habitat that FWS extended to essential recovery habitat on federal lands years before formal adoption of the 2016 policy, and instead will apply a presumption that favors stripping federal lands of critical habitat protection when critical habitat opponents seek to develop and exploit the very ecosystems that imperiled species depend upon for their recovery.

105.   FWS's failure to articulate a rational connection between the facts found and the choice made or to provide an adequate justification for reversing the 2016 Policy with respect to federal lands renders FWS's decision arbitrary, capricious, an abuse of discretion, and not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2).

## FIFTH CLAIM FOR RELIEF

### (VIOLATION OF THE NATIONAL ENVIRONMENTAL PROTECTION ACT AND ADMINISTRATIVE PROCEDURE ACT: FAILURE TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT OR ENVIRONMENTAL ASSESSMENT)

106.   Plaintiffs reallege and incorporate by this reference each and every allegation set forth in this Complaint.

107.   In enacting the National Environmental Policy Act of 1969, Congress declared "a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).

To accomplish its purposes, NEPA establishes "important 'action-forcing' procedures." *Id.* (citation omitted).  The statute ensures that federal agencies, in making decisions, "will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Id.* at 349.  NEPA "also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision," including the public.  *Id.*

108.   NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental effects of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  A "major federal action" for which an environmental impact statement may be required includes "[a]doption of official policy, such as rules, regulations, and interpretations adopted under the Administrative Procedure Act, 5 U.S.C. 551 *et seq.* or other statutes."  40 C.F.R. § 1508.1(q)(3)(i); *see also id.* § 1508.1(q)(2).  The environmental effects that must be considered in an EIS include effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action, including those effects "that are later in time or farther removed in distance from the proposed action or alternatives." *Id.* § 1508.1(g).

109.   Under regulations adopted by the Council on Environmental Quality

("CEQ"), the federal agency responsible for overseeing implementation of NEPA,

federal agencies may satisfy compliance with NEPA for any action by (1)

preparing an EIS, (2) preparing a less extensive environmental assessment ("EA")

and making a finding of no significant impact on the environment; or (3)

documenting that the action falls within an established categorical exclusion.  *Id.* §

1501.3(a).

110.   CEQ has defined "categorical exclusion" to mean "a category of

actions that the agency has determined, in its agency NEPA procedures . . .,

normally do not have a significant effect on the human environment."  *Id.* §

1508.1(d).  Agencies are tasked with identifying categories of actions "that

normally do not have a significant effect on the human environment, and therefore

do not require preparation of an environmental assessment or environmental

impact statement."  *Id.* § 1501.4(a).  In the event an agency determines that a

categorical exclusion applies, federal agencies are further mandated to evaluate the

action for "extraordinary circumstances in which a normally excluded action may

have a significant effect."  *Id.* § 1501.4(b).  If that is the case, agencies may

categorically exclude the proposed action only if the agency determines there are

circumstances that lessen the impacts or other conditions sufficient to avoid

significant effects; otherwise, the agency must prepare an EA or EIS, as appropriate.  *Id.*

111.   FWS has adopted a categorical exclusion for "[p]olicies, directives, regulations, guidelines:  that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case," except in situations where any of the extraordinary circumstances in 43 C.F.R. § 46.215 apply.  43 C.F.R. § 46.210(i).  Section 46.215, in turn, lists extraordinary circumstances to include, in part, where FWS actions "may":

> (b)  Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands …; floodplains …; national monuments; migratory birds; and other ecologically significant or critical areas.

> (c)  Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources … .

> (d)  Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

> *        *        *

> (e)  Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

50

*     *     *

(h)  Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species.

112.   Here, FWS concluded that the Mandatory Exclusion Rule was categorically excluded from NEPA as one of the agency's "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature."  85 Fed. Reg. at 82,388 (citing 43 C.F.R. § 46.210(i)).  To the contrary, the Mandatory Exclusion Rule removes vital protections from threatened and endangered species by changing the conditions for designating critical habitat, making it harder for FWS to protect habitat areas that the best available science indicates are essential to listed species' survival and recovery, and which afford listed species the greatest legal protections.  As discussed above, the Mandatory Exclusion rule strips FWS of its statutory discretion to make critical habitat designations and exclusions on a case-by-case basis, often allows opponents of critical habitat to dictate how FWS weighs the costs and benefits of critical habitat designation, and removes the presumption against excluding federal lands from critical habitat because of the high conservation value afforded by designation.  The revisions are thus likely to have significant adverse environmental effects and are likely to harm threatened and endangered species

and their designated critical habitat.  As such, the Mandatory Exclusion Rule is far from administrative or technical.

113.   Even if the Mandatory Exclusion Rule could be covered by a categorical exclusion, extraordinary circumstances require the preparation of an EIS or, at minimum, an EA to determine whether to prepare an EIS.  The Mandatory Exclusion Rule has highly controversial environmental effects, involves unresolved conflicts concerning alternative uses of available resources, has highly uncertain and potentially significant environmental effects, involves unique or unknown environmental risks, establishes a precedent for future action and represents a decision in principle about future actions with potentially significant environmental effects, and has significant impacts on listed species, species proposed to be listed, and designated critical habitat under the ESA.  *See* 43 C.F.R. § 46.215(b), (c), (d), (e), (h).  Because the Mandatory Exclusion Rule significantly and adversely affects imperiled species and the ecosystems on which they depend, FWS could not lawfully apply a categorical exclusion to avoid the need to prepare an EIS (or, at a minimum, an EA).

114.   Further, FWS did not make any finding that "there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects" so as to escape a determination that extraordinary circumstances—as defined in

FWS's own regulations—apply, precluding reliance on a categorical exclusion. 40 C.F.R. § 1501.4(b)(1).

115.   FWS's invocation of a categorical exclusion to avoid its duty to prepare a legally adequate NEPA analysis for the Mandatory Exclusion Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of NEPA, the CEQ regulations, the FWS regulations implementing NEPA, and the APA, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

1.   Declare that FWS acted arbitrarily, capriciously, and contrary to law, including the ESA, in violation of the APA, in promulgating the Mandatory Exclusion Rule;

2.   Declare that FWS acted arbitrarily, capriciously, and contrary to law, including NEPA and the CEQ regulations, in violation of the APA, by invoking a categorical exclusion and failing to prepare an EIS or EA for the Mandatory Exclusion Rule;

3.   Hold unlawful and vacate the Mandatory Exclusion Rule;

4.   Enjoin FWS from applying or otherwise relying upon the Mandatory Exclusion Rule;

5.      Award Plaintiffs their reasonable fees, costs, and expenses, including

attorneys' fees; and

6.      Grant Plaintiffs such further and additional relief as the Court may

deem just and proper.

DATED:      Honolulu, Hawaiʻi, January 14, 2021

Respectfully submitted,

/s/LEINĀʻALA L. LEY
DAVID L. HENKIN
LEINĀʻALA L. LEY
ELENA L. BRYANT
EARTHJUSTICE

Attorneys for Plaintiffs
Center for Biological Diversity,
American Bird Conservancy,
Conservation Council for Hawaiʻi,
Defenders of Wildlife, National Parks
Conservation Association, Natural
Resources Defense Council, Sierra
Club, and WildEarth Guardians